

# EXHIBIT A

# PORTFOLIO SERVICING AGREEMENT

## AMONG

## FLATIRON FINANCIAL SERVICES INC

## AND

## CORPORATE AMERICA FAMILY CREDIT UNION

EFFECTIVE DATE: ~~March 1, 2007~~ *February 23, 2007* *pp*

**(Including Participation Sales & Servicing)**

## PORTFOLIO SERVICING AGREEMENT

**THIS PORTFOLIO SERVICING AGREEMENT ("SERVICING AGREEMENT" OR "AGREEMENT") IS MADE THIS 23RD DAY OF FEBRUARY, 2007 AMONG FLATIRON FINANCIAL SERVICES INC. A DELAWARE CORPORATION ("SERVICER") AND CORPORATE AMERICA FAMILY CREDIT UNION ("CLIENT").**

1.01    "Business Day" means any day on which ordinary business dealings are carried on at Servicer's offices, excluding Saturday, Sunday and any day on which the Servicer's offices are closed because of a regularly scheduled holiday.

1.02    "Collateral" means a Financed Vehicle and any other property pledged to secure an Obligation.

1.03    "Collateral Documents" means promissory notes, security agreements, installment purchase contracts, applications and warranties pertaining to the Receivables.

1.04    "Collateral Period" means a semi-monthly period beginning on the 1st day of the month and ending on the 15th day or beginning on the 16th day of the month and ending on the last day of the month.

1.05    "Default" means the failure of an Obligor to pay when due any amount under the terms of the Collateral Documents or a violation of any term or condition of a Collateral Document.

1.06    "Defaulted Receivable" means any Receivable, unless Servicer determines, with Client's consent, extenuating circumstances exist, (i) with respect to which any payment or portion thereof has been due and unpaid by the Obligor for 60 days or more, (ii) on which any payment or portion thereof is less than 60 days past due but as to which the Servicer, in the normal course of performing its duties hereunder, has determined it is unlikely that past due payments will be brought current through routine efforts by the Servicer, or (iii) with respect to which a Default has occurred and the Servicer reasonably believes that, as a result of such Default, such Receivable is likely to become a Defaulted Receivable.

1.07    "Disbursement Date" is defined in Section 2.09.

1.08    "Effective Date" means the date first written above.

1.09    "Financed Vehicle" means any vehicle and all accessions thereto securing an Obligor's indebtedness under a Collateral Document.

1.10    "Insurance Policies" means the Risk Default Policy and the VSI Policy.

1.11    "Liquidation Proceeds" means, with respect to any Receivable, all funds, amounts and proceeds collected from any source whatsoever in respect thereof and the related Financed Vehicle (including, but not limited to, collections, insurance proceeds, dealer recourse and third party guarantees).  .

1

1.12   "Obligor" means, with respect to a Receivable, the person primarily liable on such Receivable and each co-signer and guarantor and any other person responsible for payments of the Receivable.

1.13   "Receivable" means the indebtedness of an Obligor to Client under a promissory note, security agreement, loan, contract, motor vehicle retail installment sale contract or other document evidencing the indebtedness of an Obligor to Client.

1.14   "Risk Default Policy" means an insurance policy for motor vehicle repossession losses.

1.15   "Trust Account Depository" means the payment deposit account maintained at Servicer's regular financial institution that is an FDIC-insured financial institution or such other financial institution as may be mutually agreed upon by Servicer and Client.  All moneys deposited into the Trust Account Depository shall remain the property of Client and shall be held in trust by the Servicer, as fiduciary, for the benefit and account of Client, unless and until such time as the moneys are expended for the purposes authorized in this Agreement or forwarded to Client.

1.16   "VSI Policy" means a vendor's single interest physical damage insurance policy.

## ARTICLE 2
## ADMINISTRATION AND SERVICING OF RECEIVABLES

2.01   <u>Appointment and Duties of Servicer</u>.  Client hereby appoints the Servicer to manage, administer, service and make collections on the Receivables attributable to motor vehicle retail installment contracts ("Loans") arising under the Centrix Financial LLC Porfolio Management Program and such other Receivables as Client may request Servicer to process. In performing its duties, Client grants to the Servicer full power and authority to do or cause to be done any and all things in connection with such servicing and administration of the Receivables which it may deem necessary or desirable to carry out its duties under this Servicing Agreement. This delegation of authority to Servicer is subject to the restrictions set forth in this Agreement, including, without limitation, Section 2.02. Except as expressly set forth herein, Servicer, and any independent contractors and agents retained by Servicer, shall perform the services, duties and obligations required under this Agreement skillfully, carefully and diligently, and in accordance with the best standards, policies and procedures the Servicer applies with respect to similar Receivables serviced by it.  The authority of the Servicer to act hereunder shall be exercised in good faith, in the best interests of Client and in compliance with the Client's written loan policy.  Servicer may use such employees and agents as it deems necessary or desirable to carry out its duties and obligations hereunder.  This Agreement shall replace all prior Portfolio Servicing Agreements in effect between Servicer and the various parties to this Agreement.

2.02   <u>Collection of Receivable Payments</u>.

(a)   The Servicer shall be responsible for collection of payments under the terms of the Loans and in accordance with the Credit and Collection Policy. The Servicer may grant one (1) extension of maturity, not to exceed thirty (30) days, without the

consent of the Client, as it may deem advisable in the regular course of business.  Any additional extension of maturity shall be submitted to Client for written approval.

(b)     Servicer may grant Obligor one (1) request for a change to Obligor's due date.  In no event shall the change in due date exceed thirty days. Said request shall only be granted after Obligor has made the first installment payment on a Loan. Servicer shall not grant a request to change Obligor's due date concurrent with granting Obligor a Loan payment deferment. Servicer may grant Obligor a Loan payment deferment up to five (5) times during the term of a Loan contingent upon receiving a minimum of six (6) consecutive payments between deferments.  No extension, revision, modification or amendment shall be made which would void coverage of the Loan or Receivable under the VSI Policy or Risk Default Policy.  Servicer shall not consent to the reduction of the principal balance of a Receivable except with the written consent of the Client in connection with a settlement in the event the Receivable becomes a Defaulted Receivable.

(c)     Within a reasonable period of time after a Default has occurred, and taking into account such factors as Servicer considers appropriate (such as the Obligor's payment history), the Servicer will make reasonable and customary efforts to contact the Obligor by telephone. The Servicer shall continue its efforts to obtain payment from such Obligor until such time the Obligor has made the scheduled payments, the motor vehicle has been repossessed or the Obligor has filed for bankruptcy protection.

2.03   Responsibility for Processing of Insurance Claims.

(a)     The Servicer, on behalf of Client, will administer and enforce the rights and responsibilities of the holder of the Receivables and/or Loans provided for in the Insurance Policies relating to the Receivables.  If applicable, the Servicer shall verify that each Financed Vehicle is insured under a VSI Policy and, if applicable, that the Receivable or Loan is insured under a Risk Default Policy each naming Client as loss payee.

(b)     In the event a Receivable or Loan is currently not insured by a VSI Policy and if Client requests, Servicer shall make reasonable best efforts to arrange for a VSI Policy to be obtained for Client, at Client's discretion, with respect to certain or all Receivables or Loans of Client as identified by Client.  All premiums associated with any such VSI Policy and any deductible/SIR associated with the VSI Policy shall be paid by Client.  Nothing in this section shall prevent Client from purchasing a VSI Policy, or similar coverage on any or all of its Receivables or Loans, at its own cost and expense.

(c)     The Servicer will administer the filings of claims under the VSI Policy and Risk Default Policy by filing the appropriate notices and shall make the claims with the respective carriers in a timely manner to avoid disallowance of the claims due to late filings.  Otherwise, the Servicer shall not be required to pay any premiums or perform any obligations under the Risk Default Policy and shall not be required to institute any litigation or proceeding or otherwise enforce the obligations of any insurer.

3

(d)    Following application of the proceeds from the repossession and sale of a Financed Vehicle and payment of a claim under the applicable Risk Default Policy, Client shall be entitled to subsequent collections with respect to the Loan or Receivable to the extent of its unrecovered principal loss, including accrued and unpaid interest and all expenses of collection (the "Deficiency"), and the balance, if any, shall be paid to the insurance company.  In pursuing collection of its Deficiency, Client may exercise the "Client Deficiency Collection Option" identified in Section 2.08(d).

2.04    <u>Records</u>.  The Servicer shall maintain or cause to be maintained such books of account and other records as will enable Servicer to inform Client of the status of each Receivable and any Insurance Policy relating thereto.

2.05    <u>Maintenance of Security Interests in Financed Vehicles and Receivables</u>.

(a)    Servicer will ensure that Client has a valid, first priority perfected security interest in and to all Financed Vehicles. Liens will be perfected in the name of Client using the address of Servicer. Reports will be provided to Client concerning new liens perfected, any liens not perfected, Loans paid off with release of lien, and Financed Vehicles repossessed and processed for sale.

(b)    If Servicer receives written notice of the fact that some action is required to maintain perfection of a security interest in a Financed Vehicle, it shall notify Client and take all steps necessary to perfect or maintain perfection of the security interest in such Financed Vehicle in the name of Client.

(c)    The Servicer shall, at the written direction of Client, take any reasonable action necessary to preserve and protect the interest of Client in the Receivable, including any action specified in any opinion of counsel delivered to Client.

2.06    <u>Covenants of Servicer; Information</u>.

(a)    The Servicer shall not release any Financed Vehicle securing any Receivable from the security interest except upon payment of such Receivable in full or upon transfer of the Financed Vehicle to a successor purchaser of the vehicle following repossession by the Servicer.

(b)    The Servicer shall defend the right, title, and interest of Client in, to and under such Receivables against all claims of third parties.

(c)    The Servicer shall make available to Client any information known to Servicer concerning the physical condition of a Financed Vehicle.

(d)    The Servicer shall promptly notify Client through Servicer's ePortfolio computer database system (the "ePortfolio system") and make available to Client any information known to Servicer of any bankruptcy, insolvency or similar proceeding relating to any Obligor or the death or incapacity of any Obligor.

4

(e)    The Servicer shall maintain an errors and omissions insurance policy providing coverage in an amount of not less than $1,000,000 and a fidelity bond in an amount of not less than $1,000,000, in such form as is customary for loan servicers acting in respect of consumer loans on behalf of institutional investors.

2.07    <u>Annual Statement of Compliance</u>.    The Servicer shall deliver to Client on or before March 31 of each year, a certificate of an officer of Servicer, dated effective as of December 31 of the preceding year, stating that (i) a review of the activities of the Servicer during the preceding 12-month period ending on December 31 and of its performance under this Servicing Agreement has been made under such officer's supervision, and (ii) based on such review, the Servicer has materially fulfilled all of its obligations under this Servicing Agreement throughout such year or, if there has been a default in the fulfillment of any such obligation, specifying each such default known to such officer and the nature and status thereof.

2.08    <u>Servicing Rate</u>.

(a)    The Servicer rate, effective as of the Effective Date and until February 28, 2007, shall be 1.62.% on an annualized basis, assessed and paid monthly on all Qualifying Transactions, at the end of the month. "Qualifying Transactions" refers to all Receivables that have had a "consumer generated" payment posted to the loan during the previous billing period.    The Servicer will not charge Client, and the Client will not pay to Servicer, any Servicing rate for the month of March 2007. Beginning on April 1, 2007, the Servicing rate shall be 2.92% on an annualized basis, assessed and paid monthly on all Qualifying Transactions, at the end of the month.

(b) Notwithstanding subsection 2.08(a), beginning on April 1, 2007, when the principal balance due on a Receivable in the Client's portfolio of Loans at the beginning of a calendar month is below $8500, the monthly servicing fee attributable to that particular Loan shall be based upon the following schedule for all loans with a Qualifying Transaction. "Qualifying Transactions" refers to all Receivables that have had a "consumer generated" payment posted to the loan during the previous billing period:

| Tier | Individual Active Loan Principal Balance | Monthly Servicing Fee Range Within Tier |
|------|------------------------------------------|------------------------------------------|
| 1    | $7,000 - $8,499                          | $20                                      |
| 2    | $5,000 - $6,999                          | $18                                      |
| 3    | $2,500 - $4,999                          | $15                                      |

| 4 | $0 - $2,499 | $12 |
|---|---|---|

(c)    All NSF fees, late fees, extension fees, Trust Account Depository interest, disposition fees or prepayment charges allowed by applicable law shall be paid to the Servicer on a monthly basis as additional compensation.

(d)    Promptly after application of the proceeds from the repossession and sale of a Financed Vehicle and payment of a claim under the applicable Risk Default Policy, Servicer shall give notice through its ePortfolio system to Client of the Deficiency and Client shall thereafter have the right to collect the Deficiency, upon written notice to the Servicer (the "Client Deficiency Collection Option").    If Client exercises its Client Deficiency Collection Option with respect to a Deficiency on a Receivable, the Servicer shall: (i) not be entitled to any fees with respect to collection of the Deficiency; and (ii) promptly turn over to Client any Collateral Documents not already in Client's possession and all other relevant information in Servicer's possession reasonably requested by Client relating to its Deficiency collection efforts.  Client shall also have the right to exercise the Client Deficiency Collection Option, in the event a Financed Vehicle cannot be located for repossession and Client instructs Servicer to charge off a Receivable (the "Unsecured Receivable Balance").

(e)    If Client does not exercise its Client Deficiency Collection Option with respect to a Deficiency on a Receivable or an Unsecured Receivable Balance, the Servicer shall promptly pursue collection of the Deficiency or Unsecured Receivable Balance on behalf of Client (if permitted by applicable law). Servicer shall be entitled to 50% of all amounts collected with respect to such Deficiency or Unsecured Receivable Balance, but Servicer shall bear all expenses of collection of the Deficiency or Unsecured Receivable Balance, including court costs and attorney fees if litigation is commenced (and Client shall not be required to reimburse Servicer under Section 2.11 for any costs and expenses in pursuing the Deficiency or Unsecured Receivable Balance).

2.09    <u>Disbursement Dates</u>.  For the Collection Period dated from the 1st day of the month through the 15th day of the month, the Disbursement Date shall be the 25th of the same month. For the Collection Period date from the 16th day of the month through the final calendar day of the month, the Disbursement Date shall be the 10th day of the following month.  On each Disbursement Date, the Servicer shall disburse all amounts collected by the Servicer for Client on the Receivables and shall retain any amounts to which Servicer is properly entitled to reimbursement and which Servicer has earned as a servicing fee.  In addition, Servicer shall retain any amounts to which Servicer is properly entitled to reimbursement and which Servicer has earned as a servicing fee concerning the prior Collections Periods from the Trust Account Depository.

6

2.10    Financial Statements; Annual Servicing Reports. On or before 180 days after the end of its fiscal year, at Client's request, the Servicer shall provide Client with the audited financial statements of Servicer. Upon request by Client, Servicer shall, on or before 120 days after the end of its fiscal year, cause an independent accounting firm to furnish a statement to Client to the effect that such firm has examined certain documents and records relating to the servicing of the Receivables and the reporting requirements with respect thereto and that, on the basis of such examinations, such servicing and reporting requirements have been conducted in compliance with this Agreement, except for (i) such exceptions as such firm shall believe to be immaterial, and (ii) such other exceptions as shall be set forth in such statement. The cost to Servicer of such statement shall be limited to 2% of the revenue payable to the Servicer under this Agreement for the fiscal year in question and any excess shall be paid by the Client. At Client's request, Servicer shall have the independent accounting firm furnish an estimate of the cost of such audit to the Client to enable the Client to make an informed decision about the costs associated with such statement, before it must determine whether to request such statement from the Servicer. In any event, Servicer shall have a Type I Statement on Auditing Standards No. 70 (SAS 70) audit report prepared by an independent certified public accounting firm at least annually and shall make such report available on its website within one week after it is prepared. Similarly, any audited financial statements of Servicer shall be posted on Servicer's website. If so posted, Servicer need not provide Client hard copies of those reports.

2.11    Costs and Expenses. Subject to Section 2.08, which provides that the Servicer shall bear all expenses of collection of a Deficiency or Unsecured Receivable Balance if the Servicer is engaged to collect the Deficiency or Unsecured Receivable Balance, Client shall reimburse the Servicer for all bona fide actual out-of-pocket costs and expenses incurred in connection with the following duties hereunder if not recovered by Servicer from the Obligor or in Liquidation Proceeds:

    (a)    With prior Client written approval, any compensation paid to outside legal counsel to protect the interests of Client in assets administered under this Servicing Agreement, except no approval shall be required where legal fees must be incurred to take action required under this Agreement, such as repossession, and the amount of such fees is reasonable and routine;

    (b)    Repossession costs, skip tracing and related disposition fees, postage, special forms and freight incurred in enforcing payment of the Receivables;

    (c)    Any sales, franchise, income, excise, personal property or other taxes arising from or related to any Receivables administered under the Servicing Agreement;

    (d)    Any parking or other fines, impound fees, insurance, title or other such fees arising from or related to any Receivables administered under the Servicing Agreement;

    (e)    Other requested services will be quoted on a time and materials basis utilizing the Servicer's current pricing schedule, if applicable, and shall be subject to Client's consent before incurrence of same.

7

Servicer's rights to reimbursement of expenses shall not be contingent upon success in skip tracing, repossession, litigation or similar activity. Servicer may retain recoveries of such out-of-pocket expenses from the Liquidation Proceeds and deposit the net proceeds in the Trust Account Depository. If Client has reimbursed Servicer for out-of-pocket expenses subsequently recovered by Servicer, Servicer shall deposit such recovered amount in the Trust Account Depository for disbursement to Client.

2.12     Possession of Original Collateral Documents; Servicer Documents

(a)     The Collateral Documents shall be held by the Client, except that Servicer shall hold the certificate of title to the Financed Vehicle (other than in states where the certificate of title is required to be held by Client or where the certificate of title is held by the vehicle owner). The Servicer shall hold any Collateral Documents in its possession for the benefit of Client and all Collateral Documents shall remain the property of Client. The Servicer shall respond to all third party inquiries concerning ownership of the Receivables by indicating that the Receivables are the property of Client. Client shall deliver to Servicer copies of the Collateral Documents in Client's possession as Servicer shall specify to Client from time to time and originals of such Documents when required by Servicer to carry out its duties hereunder.

(b)     The Servicer shall maintain records and information (which may be in electronic form) that are required to service the Receivables. The Servicer shall label or otherwise designate such records as pertaining to the Client.

2.13     Inspection and Audit Rights. The Servicer agrees that, upon prior written notice, it will permit any representative of Client, during the Servicer's normal business hours, to examine the Collateral Documents, all the books of account, records, reports and other papers of the Servicer relating to the Receivables, to make copies, to cause such books to be audited by independent certified public accountants selected by Client at such times as may be reasonably requested. Any inspection or examination must be conducted under Servicer's supervision and in a manner designed to minimize disruption to Servicer's activities and business operations. Any expense incident to the exercise by Client of any right under this paragraph, including expenses incurred by Servicer, shall be borne by Client. Upon Client providing reasonable notice to Servicer and during normal business hours, Servicer shall make available to Client all Collateral Documents in its possession and such books and records and associated information relating to the servicing of Loans for Client to perform audits on posting and data management of service standard items, repossession, claims and recoveries. Such audit will consist of one-on-one reviews with key personnel, review of sample accounts to test posting and data entry and confirmation of deferments and due date changes. Servicer may participate in the audit.

2.14     Enforcement.

(a)     If a Receivable becomes a Defaulted Receivable, the Servicer shall promptly (within 30 days) schedule a repossession of the Financed Vehicle unless (a) the Servicer has determined in good faith that doing so is not in Client's best interests or not likely to yield the best return to Client for such Receivable, or (b) Client sends written notice to Servicer that it has determined a repossession of the Financed Vehicle is not in

8

the Client's best interests.  The Servicer shall use commercially reasonable efforts to realize upon any recourse to dealers, to collect under any applicable Insurance Policy and to collect through sale of a repossessed Financed Vehicle at public or private sale conducted in accordance with (i) Revised Article 9 of the Uniform Commercial Code as adopted in the State that has jurisdiction over the repossession and liquidation of the Financed Vehicle; and (ii) other applicable law. Servicer shall attempt to obtain the wholesale market value for each repossessed Financed Vehicle but in any event may sell the Financed Vehicle at auction. If the Financed Vehicle has suffered damage, the Servicer shall not expend funds for repair or repossession of such Financed Vehicle unless the Servicer has determined in its discretion that such repair or repossession is likely to increase the Liquidation Proceeds by an amount greater than the amount of such expenses.

(b)     The Servicer may, if it determines in its discretion that legal action is warranted, sue to enforce or collect upon the Receivables and the Insurance Policies (including unpaid claims), in its own name, if possible, or as agent for Client. The commencement of servicing any Receivable under this Agreement shall constitute an automatic assignment of the Receivable and related rights under the Insurance Policies by Client to Servicer for servicing and collection purposes only (such Receivables or rights assigned therein shall be referred to as "Trust Rights"), which Trust Rights shall be serviced, collected and held by Servicer in trust pursuant to the terms of this Agreement for the benefit of Client. No further assignment shall be necessary, but Client shall execute such additional instruments and documents as Servicer may request or may be required under applicable law, in order to fully evidence Servicer's right to collect such Receivable for Client in Servicer's own name for the benefit of Client. In exercising any recourse rights, the Servicer is hereby authorized on Client's behalf to reassign the Receivable and to deliver the certificate of title to the Financed Vehicle to the person against whom recourse exists at the amount set forth in the document creating the recourse.

(c)     The Servicer may grant to the Obligor on any Receivable any rebate, refund or adjustment that the Servicer in good faith believes is required because of prepayment in full of the Receivable, and may deduct the amount of any such rebate, refund or adjustment from the amount otherwise payable by the Servicer to Client.

(d)     The Servicer may not increase or reduce the amount of any Scheduled Payments, change any Loan interest rate or extend or rewrite any Loan except as provided in 2.02(a).

2.15    Substitution of Collateral.  If a Financed Vehicle sustains significant physical damage such that the insurance company carrying the physical damage insurance covering such Financed Vehicle determines that the Financed Vehicle is not repairable, the Servicer may permit the Obligor to pledge a vehicle of equal or greater market value than that of the Financed Vehicle immediately prior to sustaining the physical damage; provided, that any such substitution shall not be made if to do so would void coverage of the related Receivable under the VSI Policy or Risk Default Policy. · The second vehicle shall be substituted as the collateral ("Substituted Financed Vehicle") for the Receivable and the terms of the Receivable shall not be amended or

9

modified except to reflect the substituted collateral. The Servicer shall make appropriate notation in its records of the substitution of the collateral.

2.16   Cooperation Regarding Sale of Receivables. The Client may sell all of its right, title and interest in any or all of the Receivables and/or Loans at any time in its sole discretion and the Servicer shall cooperate with the Client and provide information reasonably required by the Client in connection with a sale of the Receivables and/or Loans. If the Receivables and/or Loans being sold are transferred to another servicer, then (a) the Servicer and Client shall mutually, expeditiously and in good faith proceed to agree upon, document, and comply with a "Deconversion" as defined and set forth in Section 5.03, and (b) Client acknowledges that no insurance coverage may be available from the Risk Default Carrier for such sold Receivables and/or Loans absent the new servicer being an "approved underwriter" as defined by the Risk Default Policy.

## ARTICLE 3
## TRUST ACCOUNT; COLLECTIONS;
## STATEMENTS TO CLIENT

3.01   Trust Account. All payments made with respect to the Receivables shall be deposited in the Trust Account Depository. All funds collected with respect to the Receivables, net of Servicer's fees and out-of-pocket expenses, will be disbursed to Client on or before the following Disbursement Date. The Servicer shall hold funds in the Trust Account Depository in trust for the benefit of Client, as fiduciary. Servicer has no equitable or ownership interest in funds in the Trust Account Depository except to the extent Servicer is specifically entitled to payment from the Trust Account Depository as provided herein.

3.02   Collections. The Servicer shall no later than the close of business on the Business Day after receipt of available funds by the Servicer, deposit to the Trust Account Depository all payments by or on behalf of the Obligors, including proceeds received from any claims made under any of the Insurance Policies with respect to a Receivable subject to Servicer's right to fees and reimbursement of expenses as provided herein.

3.03   Disbursements from the Trust Account Depository. On or before each Disbursement Date, Servicer shall submit a disbursement report to Client ("Disbursement Report"). The Disbursement Report shall contain a description of all amounts then due and owing to the Servicer and Client for such Collection Period. Servicer shall distribute all amounts in accordance with the Disbursement Report on or before the Disbursement Date.

## ARTICLE 4
## DEFAULT, REMEDIES AND INDEMNITY

10

4.01    Events of Default.  Any of the following acts or occurrences shall constitute an event of default under this Servicing Agreement:

(a)    The failure by either Client or Servicer to observe or perform in any material respect any covenant or agreement required to be performed under this Agreement or the failure to make any payment required to be made under the terms of this Agreement which failure continues unremedied for a period of thirty days after notice of such failure shall have been given to the party required to make such payment or observe or perform such covenant or agreement provided, however, if the breach is of such a nature that it cannot reasonably be cured within thirty days, such party shall not be in default if it commences to cure the breach within such thirty day period and diligently takes action to cure such breach at all times thereafter.

(b)    The entry with respect to either Client or the Servicer of a decree or order for relief by a court or agency or supervisory authority having jurisdiction under any present or future federal or state bankruptcy, insolvency or similar law; or

(c)    A conservator, receiver or liquidator is appointed with respect to either Client or the Servicer in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings.

4.02    Remedies and Indemnification.  If an Event of Default has occurred with respect to a party and is continuing, the other party may exercise any right or remedy available to it under this Agreement or under applicable law and, in addition, may terminate this Agreement by giving written notice to the other party.  Except as limited or conditioned herein, each party shall indemnify the other against loss or damage caused by the breach of any warranty, covenant or provision contained in this Agreement.

4.03    Compliance with Law.  Servicer shall comply with federal, state and local laws pertaining to collection and servicing of the Receivables.  In performing their respective duties hereunder, each party shall comply with all federal and state laws, rules and regulations including, without limitation, those pertaining to origination, documentation and administration of automobile loans and rules concerning protection of consumer privacy.

4.04    Liability of the Servicer.  Servicer shall be strictly accountable to Client for all payments actually received on Receivables.  However, in no event shall Servicer be liable for any consequential, incidental or special damages including, but not limited to, damages for loss of funds, data, profits, goodwill or prospective business opportunity.  In the event of any error or mistake not covered by section 4.02 (collectively "errors") of this Agreement by Servicer, it is agreed that the measure of Servicer's liability shall be: (a) the out of-pocket costs payable by Client to third parties, and (b) any amount which Servicer is unable to collect on behalf of Client with respect to any Receivable as a result of Servicer's errors after making reasonable efforts to do so; but in no event shall Servicer's liability exceed the amounts paid to Servicer by Client for the services under this Agreement, plus reasonable costs, including attorneys fees, of Client. The only warranties made by Servicer are the specific obligations contained in this Agreement, and there are no other warranties, express or implied. Notwithstanding any other provision of this Agreement, in no event shall Client be liable for any consequential, incidental or special

11

damages including, but not limited to, damages for loss of funds, data, profits, goodwill or prospective business opportunity.

    4.05   <u>Warranties, Representations and Indemnity</u>.

        (a)   Each party hereto warrants and represents that the Collateral Documents furnished by that party are free of illegal or prohibited powers or provisions and that the enforcement thereof in accordance with all laws and regulations pertaining to collections by the Servicer will not subject Client or Servicer, as applicable, to liability under any federal, state or local law, provided such enforcement by the Servicer is conducted in accordance with the provisions of this Agreement, applicable law and the Servicer's normal operating procedures.

        (b)   Each party as an inducement to the execution of this Agreement by the other, and acknowledging that the other is expressly relying thereon, does represent and warrant as follows: (i) it has full right and power and is duly authorized and empowered to enter into, execute, deliver and perform this Agreement and (ii) the execution, delivery and performance by it of the terms and conditions of this Agreement shall not, by a lapse of time, the giving of notice or otherwise, constitute a violation of any applicable law or a breach of a provision contained in its respective Articles of Incorporation, Membership Agreement, or By-Laws, if applicable, or contained in any agreement, instrument or document to which it is bound, nor will it enter into any future agreement, instrument or document that would breach this Agreement.

        (c)   Servicer represents and warrants that it shall conduct the repossession and liquidation of any Financed Vehicle in accordance with the provisions of Revised Article 9 of the Uniform Commercial Code, as Revised Article 9 has been adopted in the State that has jurisdiction over the repossession and liquidation of a particular Financed Vehicle.

        (d)   Servicer further represents and warrants it shall comply with all federal, state and local laws including, without limitation, motor vehicle retail installment sales acts and consumer credit codes, if applicable, that pertain to the servicing and collection of the Receivables and the enforcement of lien rights in the Financed Vehicles securing the indebtedness of Obligors under the Receivables.

    4.06   <u>Force Majeure</u>.  Notwithstanding anything herein to the contrary, neither party (the "Disabled Party") shall be considered in default hereunder or have any liability to any party for any failure to perform if such failure arises out of the following causes beyond the control of such party, acts of God, terrorism or a public enemy, fire, flood or war ("Force Majeure Event"), provided, however, where the Disabled Party is the Servicer and such Force Majeure Event results in what would have been otherwise considered an Event of Default that is not, or cannot be, cured within thirty (30) days thereafter, then Client, in its sole and absolute discretion and upon written notice to Servicer, may terminate this Agreement.

**ARTICLE 5**
**TERM OF AGREEMENT**

5.01    Term of Agreement.  The term of this Agreement shall begin on the Effective Date and shall continue until all of the Receivables have been paid in full or otherwise satisfied, subject to the right of Client to earlier terminate this Agreement as provided herein.

5.02    Termination.  This Servicing Agreement may be terminated

by Client pursuant to the terms and conditions of Article 4, subsections 4.02 and 4.06 and Article 7, subsections 7.10, 7.11 and 7.12;

5.03    Deconversion.

(a)    Upon receipt of notice of the termination of this Agreement sent by either party (irrespective of whether under Article 4, Subsections 4.02 or 4.06 or Article 7 Subsections 7.10, 7.11 or 7.12), Servicer and Client shall mutually, expeditiously and in good faith proceed to agree upon, document, and comply with a "Deconversion" (as hereinafter defined) project plan, which plan shall specify a reasonably expeditious end date for Deconversion and the procedures for such Deconversion.  "Deconversion" shall mean the transfer of the servicing of the Receivables from Servicer to Client or to a third party servicer chosen by Client.

(b)    In a Deconversion, Servicer shall (a) transfer, in electronic format conforming with current industry standards, any information requested by Client that is necessary and reasonable to enable Client or its new third party servicer to continue servicing the Receivables going forward; (b) return (or cause to be returned) to Client or the replacement servicer any property belonging to Client including, without limitation, the Collateral Documents, and any records, information or data maintained by Servicer which Client had supplied to Servicer, and (c) continue to perform the Services under the terms of this Agreement until the earlier of the date on which the foregoing is transferred from Servicer to Client or the selected third party servicer, or the end date for Deconversion under the Deconversion project plan, which Services shall be at those rates then in effect under this Agreement.  Client shall pay for any and all actual out-of-pocket costs, not including any salaries or wages of Servicer's employees, reasonably incurred by Servicer relating to compliance with completing Deconversion under this subsection 5.03.

5.04    Effect of Termination.  Following termination of this Servicing Agreement, the Servicer shall promptly return all Collateral Documents in its possession to Client.

## ARTICLE 6
## MISCELLANEOUS PROVISIONS

6.01    Amendment.  This Servicing Agreement may only be amended by a writing signed by the party against whom enforcement of such amendment is sought.

13

6.02    Waivers.  The provisions of this Servicing Agreement may only be waived by written consent of the party making the waiver.  The failure of either party at any time to require performance by the other of any provision of this Servicing Agreement shall not affect that party's right to enforce such provision, nor shall the waiver by either party of any breach of any provision of this Servicing Agreement be taken or held to be a waiver of any further breach of the same provision or any other provision.

6.03    Notices.  All notices, requests, consents and other communications hereunder shall be in writing and shall be considered given upon hand delivery (including delivery by private courier); upon receipt or refusal if mailed by first class registered or certified mail, postage prepaid; upon confirmed telephonic facsimile transmission; or upon transmission by electronic mail (email) to the address or other contact information set forth below or as otherwise may be specified by giving notice to the other party:

        To the Servicer:        Flatiron Financial Services Inc
                                6782 South Potomac Street
                                Centennial, CO 80012
                                Attn:  Kevin Barry
                                Phone:  (303.) 223-7012
                                Fax:  (303) 391-3687

                                Email: kbarry@Flatironfinancial.com

                                With Copy to:

                                Flatiron Financial Services Inc
                                6782 South Potomac Street
                                Centennial, CO 80012
                                Attn:  General Counsel
                                Phone:  (303.) 223-7000
                                Fax:  (303) 391-3654

        To Client:             Corporate America Family Credit Union
                                2075 Big Timber Road

                                Elgin, Illinois 60123
                                Attn: Peter Paulson

                                Phone: (847) 214-2000
                                email:

6.04    Privacy.  Servicer acknowledges that it may receive from Client from time to time nonpublic personal information as defined in 12 CFR § 332.3(n).  Servicer shall abide by the limitations on redisclosure and reuse of such information as provided in 12 CFR § 332.10.  In particular, Servicer shall disclose and use such information received by it under an exception contained in 12 CFR § 332.13 or 332.14 or 332.15 only:

14

(a)    To the affiliates of Client.

(b)    To Servicer's affiliates, but its affiliates shall disclose and use such information only to the extent Servicer may disclose and use such information.

(c)    Pursuant to an exception contained in 12 CFR § 332.13 or 332.14 or 332.15 in the ordinary course of business to carry out the activity covered by the exception under which it received the information.

Furthermore, Servicer agrees that if it receives nonpublic personal information other than under an exception in 12 CFR § 332.13 or 332.14 or 332.15, it will disclose the information only:

(a)    To the affiliates of Client.

(b)    To Servicer's affiliates but its affiliates may disclose the information only to the extent that Servicer is permitted to disclose the information.

(c)    To any other person if the disclosure would be lawful if made directly to that person by Client.

Client acknowledges that it may receive from Servicer nonpublic personal information. Client agrees that it shall use and disclose such information subject to the same conditions and limitations applicable to Servicer as provided above.

6.05    <u>Severability of Provisions</u>.    If one or more of the provisions of this Servicing Agreement shall be held invalid for any reason, such provisions shall be deemed severable from the remaining provisions of this Servicing Agreement and shall not affect the validity or enforceability of the remaining provisions.

6.06    <u>Powers of Attorney</u>.    Client hereby appoints Servicer as its attorney-in-fact for the limited purpose of signing documents necessary to perfect and maintain perfection of the liens and security interests in the Financed Vehicles; granting extensions under subsections 2.02(a) & (b); endorsing checks and instruments for deposit into the Trust Account Depository; releasing a lien upon full payment of a Receivable; executing on behalf of Client certificates of title and odometer disclosure statements; transferring title to the buyer of a Financed Vehicle at a sale foreclosing such security interest following repossession; correcting typographical, mathematical or similar routine errors on any of the Collateral Documents and filing insurance claims.  With respect to other matters, Client shall, from time to time, provide to the Servicer or its employees limited, revocable powers of attorney or other such written authorizations as may be appropriate to enable the Servicer and its agents and employees to perform its obligations under this Servicing Agreement.

When the mileage of any Financed Vehicle is required for any form or loan document, Servicer and its designees are directed to enter the mileage reading on the dashboard of each Financed Vehicle as the true and correct mileage of such vehicle.  Client will hold harmless Servicer and its agents acting pursuant to this power of attorney against any and all costs, claims, or actions whatsoever based upon or resulting from inaccuracy of the odometer

15

reading on any vehicle or any odometer statement prepared in connection therewith unless such accuracy is caused by Servicer or its agents, in which event Servicer shall hold harmless Client against any and all costs, claims, or actions whatsoever.

6.07    <u>Assignment and Binding Effect</u>.    Subject to Section 2.16, this Servicing Agreement may be assigned only with the written consent of the parties hereto; however, in the event of an assignment, all provisions of this Servicing Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto. In the event of an assignment by Servicer (with the written consent of Client), Servicer will use its reasonable best efforts to facilitate a smooth transition to minimize the disruption that may be caused by such assignment.

6.08    <u>Legal Holidays</u>.    In the case where the date on which any action required to be taken, document required to be delivered or payment required to be made is not a Business Day such action, delivery or payment need not be made on that date, but may be made on the next succeeding Business Day.

6.09    <u>Gender/Pronouns</u>.    When required by the context, the singular shall include the plural and the plural shall include the singular.  The use of any gender shall include any other gender.  Unless specifically limited, the use of the word "including" shall mean "including but not limited to."

6.10    <u>Survival</u>.    Any provision not limited in its application to the term of this Agreement shall survive termination of this Agreement.  Termination of this Agreement shall be without prejudice to any remedies for breach of any covenant, representation or warranty contained herein.

6.11    <u>Counterparts; Fax</u>.  This Servicing Agreement may be executed in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute a single instrument binding on the parties.  Each party agrees that the other may deliver this Agreement or an executed counterpart by facsimile transmission and possession of such facsimile shall be deemed the equivalent of possession of an original signature.

6.12    <u>Governing Law</u>.  The provisions of this Agreement shall be construed and interpreted in accordance with the laws of the State of Colorado, but to the extent performance by either party of its obligations and duties occurs in another state, the laws of such other state shall govern that performance.

6.13    <u>Mutual Confidentiality of Proprietary Information</u>.

(a)    All information obtained by Servicer from Client or any affiliate of Client which relates to the investment activities, performance, statistics, investor information, terms of any agreement or proposed agreement related to any credit facility of Client or any of its affiliates and the results of Client's activities under this Agreement and any other information received from Client marked "Confidential" shall be considered confidential information. Servicer shall hold all such confidential information in trust and shall not disclose or disseminate

16

such information to any third party except as necessary in the performance of Servicer's duties hereunder unless expressly authorized in writing by Client.

(b)    Client acknowledges that the designs, specifications, manuals, documentation and other materials related to the services performed and the products produced hereunder by Servicer, and all other systems, programs, designs, specifications, manuals, documentation and other materials which are utilized, developed or made available by the Servicer in connection with this Servicing Agreement ("Other Materials") are the confidential, proprietary and trade secret property and information of the Servicer and shall remain as such property and information of the Servicer, both before and after the term of this Agreement. Client shall not copy, sell, assign, transfer, distribute or disclose all or any part of Servicer's confidential information to any other person, partnership, corporation or other entity, other than Client's members, managers, administrative service providers, accountants, attorneys, administrators, auditors and certificate holders and their respective employees and agents who require such knowledge and use in the ordinary course and scope of their services to Client and Client's affiliates, and to prospective investors in Client's affiliated entities, to the extent such information may be material in connection with a prospective investor's investment in entities affiliated with Client.

(c)    Confidential information shall not include such information which is now or becomes part of the public domain by virtue of publication other than by or through wrongful or improper disclosure, or is rightfully received from a third party who has a right to disclose such information, without restriction on disclosure and without breach of this Agreement or any other agreement between the parties hereto.

6.14    Entire Agreement.  This agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior understandings or writings, if any, with respect thereto.

## ARTICLE 7
## SERVICING & COLLECTION STANDARDS

7.01    Monthly Statement to Obligor.  Servicer will mail to all Obligors a monthly statement and notice of repayment commitment stating the current account status of the Receivable and the date that payment is due.  Any statements returned as undeliverable will be assigned to skip tracing.

7.02    Perfection of Security Interest.  Servicer will perform all titling and security interest perfection functions.  Staff will perform duties related to initial perfection of lien, release of title and title processing required for the sale of repossessed Collateral.  Liens will be perfected in the name of the Client using the address of the Servicer. Reports will be available to the Client concerning new liens perfected, liens not perfected over 90 days, loans paid off with release of lien, and Collateral repossessed and processed for sale.

7.03    Customer Service.  Servicer will provide customer service staff to non-delinquent Obligors to respond to all inquiries regarding their Receivable. Additionally, customer service staff will "Welcome Aboard" all new Obligors to verify customer information, review contract

specifics, and to educate the Obligor regarding repayment expectations. Reports will be available to Client concerning staffing, inbound call volumes, abandonment rates, outbound call volumes, contact success rates, individual staff production, and call quality monitoring.

7.04    <u>Collection of Delinquent Receivables.</u>  Servicer will provide collection staff for delinquent Receivables. Collection activity will begin when a Receivable payment is three (3) days past due. Collection mailings, automated calling campaigns, predictive dialing campaigns with live associates, managed manual calling campaigns, and field contacts at the Obligor's place of residence or employment will be used by the collection staff. Payment options for curing the delinquent Receivable will include mailing, electronic check by phone, wiring of cash funds, credit/debit card transaction and electronic funds transfer. Collections staff will determine if a deferment or due date change is appropriate, subject to management and Client approval if required herein.

(a)    <u>Early Stage Delinquencies.</u>  Receivables less than thirty (30) days delinquent will be assigned to dedicated calling campaigns created and monitored by managers within the collections staff.

(b)    <u>Thirty Days Plus.</u>  Receivables greater than thirty (30) days delinquent will be assigned to collections staff dedicated to collection efforts on a recurring basis. Calling campaigns will also be created, monitored, and presented as a whole to this group of collections staff for contact with delinquent Obligors.

7.05    <u>Loss Control and Remarketing.</u>

(a)    Servicer will provide staff for managing repossessions, impound/confiscation recoveries and liquidation of Collateral at auction or other appropriate sale facility. Repossession decisions will be made in cooperation with the collection staff, subject to approval by managers, and actual repossessions will be performed in an expedient and efficient manner. The average initial review for potential repossession will occur between the forty-fifth (45) and sixtieth (60) day of delinquency. Repossession approval will vary by account and circumstance. Staff will evaluate the condition of the repossessed Collateral, submit claims to the VSI Policy carrier, if appropriate, determine resale pricing for repossessed Collateral and monitor the sale process. Reports will be available to the Client concerning staffing, inbound and outbound call volumes, new repossession assignments, repossession of Collateral, inventory available for sale, sales completed, percent of wholesale book value, trade value, sale floor value, timing of repossessions and sales, recording of all costs associated with the recovery and sale of Collateral, performance regarding recovery and sale of all repossession vendors and auction sale houses and individual production and proficiency reporting on all associates within the Loss Control and Remarketing Department.

(b)    Through its ePortfolio system, Servicer shall provide Client with information concerning the servicing standards and requirements of Servicer, copies of all notice and related forms used by Servicer to notify Obligors of default or other collection activity and the collection status of any Receivable and any Insurance Policy claim relating thereto, and recoveries received by Servicer after charge-off of the

Receivable. Information furnished by Servicer to Client hereunder shall be updated through the most recent Collection Period and shall include information relative to the Key Performance Matrices of Section 7.9, and the status of repossession (or basis for deferral thereof) and/or skip tracing with respect to any Defaulted Receivables.

7.06     Skip Tracing.

(a)     Servicer will provide skip tracing staff to attempt to locate Obligors and/or the Collateral associated with the Receivable in the event it becomes apparent that such location is not currently accurate. Staff will utilize various processes and information technology in an attempt to procure accurate location information. Reports will be available to the Client concerning staffing, new location information requests, new locates, disposition after locate, costs associated with acquiring location information, assignments to the VSI Policy carrier for skip claim, result of VSI Policy assignment, associate production and proficiency, and call quality monitoring.

(b)  .   Notwithstanding anything to the contrary in this Agreement, Client retains the right, in its sole and absolute discretion, to perform skip tracing services (in addition to those services to be performed by Servicer under this Agreement), relating to the Obligor and the Collateral securing its Defaulted Receivables. Prior to commencing any skip tracing services, Client shall provide written notice to Servicer of its intention to perform any skip tracing services. At all times in the performance of any skip tracing services Client shall comply with all applicable federal, state and local laws consistent with the obligations of Servicer in subsection 4.03 of this Servicing Agreement. All relevant Obligor and Collateral location information procured by Client shall be promptly conveyed to Servicer. Servicer shall promptly use such information to recover the Collateral. Client may also accept a voluntary surrender of its Collateral by the Obligor, provided that Client (i) promptly communicates to Servicer that it is in possession of its Collateral; and (ii) implements all instructions of Servicer relating to the turnover of the Collateral to Servicer or its agent, to ensure that there is no impairment in Risk Default Policy coverage.

7.07     Insurance and Warranty Issues. Servicer will provide staff to manage customer provided insurance claims, customer purchased warranty claims, and in obtaining refunds on behalf of Client in the event of a default of the Receivable. The Insurance Department associates will contact both Obligors and insurance carriers to ensure repair of Collateral, negotiate total loss, and monitor the existence of insurance coverage with the Obligors. The Warranty Department associates will assist the Obligors with the filing of insurance claims for warranty, accidental death, disability, and other similar events. Dealerships will be contacted to arrange for refunds of any additional GAP or other warranty programs. Reports will be available to the Client concerning staffing, insurance claim filings and recoveries, warranty claims, "soft addition" product refund recoveries, timing of all recoveries, and individual associate production.

7.08     Administrative Support. Servicer will provide staff to assist in additional administrative functions related to the servicing of Receivables. This support group will perform production and servicing functions including the reconciliation of data and the reporting of all Receivables to all three national credit bureaus, in Servicer's name, processing of all incoming

19

and outgoing correspondence to and from the Obligors, act as liaison between Servicer and outside collection resources utilized in the recovery of deficiency balances and other administrative tasks related to servicing Receivables.

7.09    Key Performance Matrices.    Servicer will achieve and maintain specific performance levels for the (i) PMP portfolio in its entirety; and (ii) Loan portfolio of the Client if Client's Receivable portfolio consists of 60 or more Loans; in key areas as defined below:

A minimum of 75% of all repossessions will be completed prior to 180 days delinquency.

A minimum of 75% of all Collateral repossessed will be liquidated within 45 days of sale availability (defined as the time period required by state law for redemption after repossession or in the absence of such state law a period of 10 days will be used as the redemption period following repossession).

7.10    Required Actions by the Servicer.    In the event the performance of Client's portfolio within the PMP reaches the triggers outlined above in Sections 7.09 the following remedies will be enacted:

(a)    The Servicer will isolate all activity on Client's portfolio to dedicated personnel. Specific campaigns for Client's portfolio will be created and executed daily. Additional reporting showing information including but not limited to contact attempts, campaign effectiveness data, portfolio penetration, dollars collected, new repossession assignments, repossessions completed, Collateral sale inventory, Collateral sold, insurance filings, insurance claim payments and impaired assets will be provided the program participant weekly. This accelerated process and customized reporting will continue for a period of ninety (90) days or until Client's portfolio performance in the distressed area(s) is remedied at a month end reporting interval.

(b)    If the deficiency is not cured from the activity provided in (a) above, the Servicer will continue the above described remedy for an additional ninety (90) days or until Client's portfolio performance in the distressed area(s) is remedied at a month end reporting interval. During this period, Servicer will waive all servicing fees to the Client for all servicing activities. During this period, the Client may submit a request to the Risk Default Policy carrier for the Risk Default Policy Carrier's consent to transfer the servicing to another authorized replacement servicing entity designated by the Risk Default Policy carrier and accepted by the Client.

(c)    If the deficiency is not remedied during the corrective action period as outlined in (a) and (b) above, the Client may avail itself of the remedies described above or terminate the Portfolio Servicing Agreement, and transfer the servicing functions previously performed by the Servicer. In electing to terminate the Portfolio Servicing Agreement pursuant to this Article 7 subsection 7.10, the Client hereby acknowledges and agrees that there may be no insurance coverage under the Risk Default Policy, unless the successor servicer is an "approved underwriter" as defined by the Risk Default Policy.

(d)   If the deficiency is remedied at any time during the corrective action period, the process for triggering any corrective action shall begin anew from the date the deficiency was cured.

7.11   <u>Standards and Production Levels Specifically Applied to Client's Loan Portfolio</u>

(a)   <u>Front End Collections</u>

Staffing at an account to collector ratio (ACR) not to exceed 400 accounts per collector.

Calling campaigns constructed and executed achieving a Right Party Contact (RPC) rate of a minimum of 15%.

Calling campaigns constructed and executed achieving a Promise to Contact (PTC) rate of a minimum of 70% of contacts.

Production results of a minimum of 20 telephone attempts per agent per hour for unit average.

(b)   <u>Back End Collections</u>

Staffing at an account to collector ratio (ACR) not to exceed 150 accounts per collector.

Collection strategies employed achieving a Right Party Contact (RPC) rate of a minimum of 10%.

Calling campaigns constructed and executed achieving a Promise to Contact (PTC) rate of a minimum of 50% of contacts.

Production results of a minimum of 18 telephone attempts per agent per hour for unit average.

(c)   <u>Remarketing and Loss Control</u>

Staffing at an account to agent ratio (AAR) not to exceed 250 accounts per agent.

Sale of at least 75% of all repossessed vehicles within 45 days from the date of availability (defined as the time period required by state law for redemption after repossession) on a rolling three month average achieving a minimum average of 90% of the floor amount set for sale. Floor amount is set by Servicer for each auto auctioned.

Filing of all appropriate documentation for insurance claims to the respective default protection insurance provider within the earlier of (i) 30 days of receipt of sale proceeds from the auction or constructive sale in the event of the bankruptcy

21

of Obligor or (ii) such period as may be required by the Insurance Policy.

(d)     <u>Reporting and Data</u>

All current reporting and analysis prepared for Client will continue to be available on ePortfolio. Raw data feeds, in addition to existing reporting, can be made available upon Client's request. Should such requests require additional programming or modification of available data sets, a mutually agreeable fee will be paid in advance to Servicer by Client for such services.

(e)     <u>Cumulative Default</u>

If the Loan default level for Client's portfolio of Receivables calculated from the total number of all currently outstanding Loans originated or purchased for any 3 month moving average exceeds 3%, Client will give Servicer 90 days notice of termination and Servicer will have a one time cure period of 60 days to fix the problem. A second occurrence where the 3 month moving average exceeds 3%, Client may terminate with 30 days notice, following which, Servicer's failure to cure shall constitute an inability on the part of Servicer to adequately service Client's Loan portfolio, such that the Risk Default Carrier may consent to transfer the servicing of the portfolio to another replacement servicer (the "Successor Servicer") acceptable to the Risk Default Carrier and Client. Servicer shall cooperate with Client to move the portfolio to the Successor Servicer with insurance coverage to remain in place under the Risk Default Policy, provided the Successor Servicer is an "approved underwriter" as defined by the Risk Default Policy.

7.12    <u>Termination Upon Notice</u>: Notwithstanding any other provision in this Agreement to the contrary, the Client may terminate the Portfolio Servicing Agreement at any time and designate another servicer, upon 30 days written notice. As noted in Subsection 7.10(c), if the Client chooses to do so, it acknowledges that no insurance coverage may be available from the Risk Default Policy absent the new servicer being an "approved underwriter" as defined by the Risk Default Policy.

7.13    <u>Data Back-Up Servicer</u>. At all times Servicer shall, at its own cost, contract with Via West or such other data back-up servicing entity with whom Client consents, which consent shall not be unreasonably withheld (the "Data Back-Up Servicer"). The Data Back-Up Servicer shall receive on a monthly basis all Servicer reports and download files from Servicer relevant to its servicing of the Receivables in order to back-up the records of the Servicer which are relevant to the Servicer's collection of the Receivables.

7.14    <u>Outside Vendors For Repossession and Skip Tracing</u>. Notwithstanding any other provisions of this Agreement (including, without limitation, Sections 2.14, 7.05 and 7.06), if a Receivable becomes a Defaulted Receivable and provided Client does not decide against repossession pursuant to Section 2.14, then Servicer shall promptly:

22

(a)    Retain third party vendor(s) unaffiliated with Servicer and experienced and qualified in the repossession and skip tracing services industry (the "Unaffiliated Vendor(s)").    Unaffiliated Vendors shall perform such repossession and skip-tracing services required under this Agreement, pursuant to those certain contracts currently in place between Servicer and PAR North America, Inc. dated November 10, 2005, and between Servicer and Remarketing Solutions, Inc., dated September 29, 2001 (collectively, the "Vendor Contracts"), or pursuant to such other similar Vendor Contracts with any other Unaffiliated Vendors; provided such contracts with such entities are similar to the Vendor Contracts or are otherwise in accordance with the standards prevalent in the industry relating to such services; and

(b)    Send to Client notice through its ePortfolio system that the Unaffiliated Vendor has been notified to begin performing such repossession or skip tracing services.

23

IN WITNESS WHEREOF, this Agreement is effective as of the date set forth at the head of this Agreement.

FLATIRON FINANCIAL SERVICES INC a
Delaware Corporation

By: _____

Name: _____KEVIN BARRY_____

Title: _____CEO_____


CORPORATE AMERICA FAMILY CREDIT
UNION


By: _____Peter Paulson_____

Name: _____Peter Paulson_____

Title: _____President /CEO_____

24